## CIRCUIT COURT OF THE CITY OF NORFOLK

Robert E. Long
and Susan Long

v.

Old Point Bank
of Phoebus et al.

February 25, 1997

Case No. (Law) L96-1048

BY JUDGE CHARLES E. POSTON

This action is now before the court for decision on several demurrers and motions for summary judgment filed by the defendants. The facts, taken in a light most favorable to the plaintiffs, are stated in their amended motion for judgment and will not be restated except as necessary to explain the court's rulings. The various matters for decision will be considered *seriatim*.

### I. *The Motion for Summary Judgment*
### *as to Counts I and II*

The purpose of summary judgment is to allow trial courts to bring litigation to an end at an early stage when it clearly appears that one of the parties is entitled to a judgment as made out by the pleadings and the admissions of the parties. *Kasco Mills, Inc. v. Ferebee*, 197 Va. 589, 593 (1956). However, summary judgment is not appropriate if any material fact is genuinely in

dispute. Rule 3:18 of the Rules of the Supreme Court of Virginia; *Carson v. Leblanc*, 245 Va. 135, 139 (1993). Summary judgment is a drastic remedy and is appropriate only "when it clearly appears that one of the parties is entitled to judgment within the framework of the case as it is made out by the pleadings." *Turner v. Lott*, 244 Va. 554, 556-557 (1992). In considering a motion for summary judgment, the court resolves all doubts in favor of the nonmoving party. *Costner v. Lackey*, 223 Va. 377 (1982).

The plaintiffs allege that two letters are defamatory *per se*: one from the defendant David S. Rudiger to the plaintiffs dated March 16, 1995, copies of which were sent to Michael Marks, Frank Santoro, Esq., and the Hampton Redevelopment and Housing Authority; and the second from Michael O. Marks, Senior Vice President of the defendant, Old Point National Bank, to the plaintiffs dated April 24, 1995, copies of which were sent to Davis S. Rudiger, Esq., and Frank J. Santoro, Esq. In their motion for judgment, the plaintiffs allege that these letters "were published to Hampton Roads Development Authority and, upon information and belief, to others." The letters themselves show that copies were sent to the parties specifically identified above. They seek recovery on the basis of common law defamation (Count I) and Code § 8.01-45, *et seq.*, the insulting words statute (Count II). The defendants assert that summary judgment is appropriate because (1) the alleged defamatory statements are absolutely privileged as a matter of law, (2) the only publication of the statements was privileged, (3) and the words used do not tend to violence and breach of the peace.

In asserting that the alleged defamatory statements are absolutely privileged, the defendants rely on the *Restatement (Second) of Torts*, §§ 586 and 587.[1] The former section reads:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

*Restatement* § 587 extends the privilege to parties as well:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a

---

[1] When "Restatement" is mentioned, it refers to the Restatement of Torts.

proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Virginia has long recognized that communications made in the course of judicial proceedings are absolutely privileged. Indeed, "words used in the course of a legal or judicial proceeding, however hard they may bear upon the party of whom they are used," are privileged and may bar an action, *Penick v. Ratcliffe*, 149 Va. 618, 632-633 (1927), and "[t]he rule is broad and comprehensive, including within its scope all proceedings of a judicial nature." *Donahoe Const. v. Mount Vernon Assoc.*, 235 Va. 531, 537 (1988). The rule of absolute privilege in judicial proceedings is founded upon the belief that the public interest is best served when individuals participating in lawsuits have the freedom to speak fully on the issues relating to the controversy. *Id.* at 537; *Watt v. McKelvie*, 219 Va. 645, 651 (1978); *Donohoe*, at 537. *Michie's Jurisprudence* summarizes the justification for the privilege well:

It is absolutely essential to the ends of justice that everybody should have a right to bring an action for any complaint, and also that he should make his allegations with impunity. The defendant should have a like immunity in any civil action. This is necessary to a thorough investigation of the truth. If the parties are to be placed in fear of suits for libel or slander for reflections cast upon the parties or others, or if their defense must depend upon the truth of what was said, or their ability to satisfy the jury of the absence of malice, the trial of civil suits would be far less likely to lead to correct results than where this embarrassment is not felt. Perfect freedom to say in these pleadings whatever the parties choose to bring to the consideration of the court or jury tends obviously to promote the intelligent administration of justice. This perfect freedom is more important to secure than it is to prevent these unfounded reflections on character, and moreover, if they are unfounded, they will not generally cause any lasting injury, as their injustice will appear at the trial. 12A M.J., *Libel and Slander*, § 19, p. 91.

The issue presented here, however, is whether the privilege extends to communications made prior to the commencement of litigation during the course of extrajudicial investigation relating to anticipated civil litigation. On this issue, the Supreme Court has yet to speak. The parties have not identified

any circuit court decisions addressing this point, and the court has found no guidance in circuit court decisions.

The Supreme Court has traditionally viewed the *Restatement* as persuasive authority. The court's own research has indicated that in an overwhelming number of cases in which the *Restatement's* rules were cited, the Supreme Court has concurred. Nevertheless, reliance on the dignity with which the *Restatement* is clothed is not sufficient to determine the state of Virginia law.

Kentucky, like Virginia, also recognizes the rule of absolute immunity in judicial proceedings and appears to follow the *Restatement* rules under consideration. In *General Elec. Co. v. Sargent*, 916 F.2d 1119 (6th Cir. 1990), the court in a diversity of citizenship action considered this very question with respect to Kentucky law. In reaching its decision that "Kentucky would in the proper case apply the absolute privilege to communications by a party made preliminary to a seriously considered judicial proceeding," *Id.* at 1127, the court looked to several sources for guidance: "relevant dicta from the state supreme court, decisional law of appellate courts, restatements of the law, law review commentaries, and the 'majority rule' among the states." *Id.* at 1125. In *Sargent* the plaintiff sued for "injurious falsehood" by virtue of the defendant's allegedly publishing misrepresentations blaming the plaintiff for damage to a power-generating facility. The defendant argued that the communications at issue were absolutely privileged because they were preliminary to a judicial proceeding. The court agreed that Kentucky would follow the *Restatement* rule. With respect to the case at bar, it is of significance that Kentucky's common law is based to a degree on the common law of Virginia. Constitution of Kentucky, § 233.[2]

North Carolina also recognizes that communications made in the course of judicial proceedings are absolutely privileged, *Scott v. Statesville Plywood*, 81 S.E.2d 146 (1954), and that "judicial proceeding" should be defined broadly. *Jarman v. Offutt*, 80 S.E.2d 248 (1954). In *Harris v. NCNB National Bank*, 355 S.E.2d 838 (1987), the plaintiff sought damages on several theories, including defamation, to which the defendant replied that the alleged defamatory communications were absolutely privileged. The plaintiff pleaded that the defendant's attorney at the direction of his client had written a

---

[2] Section 233 of the Constitution of Kentucky reads: "All laws which, on the first day of June, one thousand seven hundred and ninety-two, were in force in the State of Virginia, and which are of a general nature and not local to that State, and not repugnant to this Constitution, nor to the laws which have been enacted by the General Assembly of this Commonwealth, shall be in force within this State until they shall be altered or repealed by the General Assembly."

document accusing the plaintiff of obtaining property by false pretense and that the statement had been published when the attorney sent it with her own letter to the plaintiff's employer. The letter stated the defendant's legal position concerning a dispute over the proceeds of a sale of farm equipment in which the defendant claimed a security interest. No suit had been filed at the time the allegedly defamatory communications were made. The North Carolina Court of Appeals wrote:

> We hold, however, that an absolute privilege exists not only with respect to statements made in the course of a pending judicial proceeding but also with respect to communications relevant to proposed judicial proceeding [sic]. *Id.* at 842.

The court, citing both *Restatement* sections at issue in the case at bar, explained its reasoning as follows:

> the privilege is based upon the public interest of securing to all persons freedom of access to the courts to settle their private disputes, and of securing to attorneys, as officers of the court, the freedom to fully represent their clients. Both sections extend the absolute privilege to statements preliminary to proposed litigation when the statement is relevant to a proceeding which is seriously contemplated. *Id.*

The positions of both the Kentucky and North Carolina courts have been adopted by a large majority of the jurisdictions which have considered the question. A list of cases concurring with the North Carolina decision is found in *Harris* at 843. See also *General Elec.* at 1127. An annotation on the subject is found in 23 A.L.R. 4th 933.

It is necessary that counsel have the ability to investigate the circumstances of a possible cause of action before filing suit. Indeed, when an attorney tenders a pleading to the court, he gives his assurance that it is filed in good faith and not for delay. Rule 1:4 of the Rules of the Supreme Court of Virginia. When a party is not represented by counsel and files a pleading, he is bound by the same rules governing the filing of pleadings by counsel. Rule 1:5 of the Rules of the Supreme Court of Virginia. Virginia Code § 8.01-271.1, which imposes more expansive duties than the rules, provides in pertinent part:

> The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best

of his knowledge, information and belief, *formed after reasonable inquiry*, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation [emphasis supplied].

The statute further provides that a pleading filed in violation of its provisions may result in sanctions against the attorney, the party, or both. Clearly, Virginia law requires investigation of potential causes of action prior to the initiation of a suit. Should these inquiries be the basis of later actions for defamation, the policy of encouraging citizens to bring their disputes to the court for resolution would be frustrated, the policy of encouraging the settlement of disputes prior to litigation would be compromised, and the freedom to speak freely about the matters in controversy would be limited.

The court therefore holds that the *Restatement (Second) of the Law of Torts* §§ 586 and 587 accurately reflect the law of Virginia. In determining whether the privilege applies in the case at bar, a two-step analysis must be followed: "First, the occasion of the communication must be examined to determine if the statement was made 'preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding.' Second, a court must evaluate the content of the statement to determine if it 'has some relation to a proceeding that is contemplated in good faith and under serious consideration'." *General Elec.*, 1127.

With respect to the letter written by the defendant Davis S. Rudiger on March 16, 1995, it is clear that Rudiger represented Old Point National Bank. The amended motion for judgment alleges that the Longs executed a promissory note in the sum of $300,000.00 payable to the Hampton Redevelopment and Housing Authority which was secured by a deed of trust on property identified by the Longs as "the Professional Building" and later assigned to the Old Point National Bank. They further allege that they executed a note payable to the bank in the sum of $950,000.00 ("the Queen's Way Mall Loan") which was also secured by a deed of trust. Rudiger's letter advises that both of these loans were in default, asks them to contact the bank to arrange to pay the sums due, and also advises that "interest continues to accrue and *legal expenses are being incurred*." (Emphasis supplied.) Rudiger's letter notes that copies were sent to Michael Marks of the bank; Frank J. Santoro, Esq.; and the Hampton Redevelopment and Housing Authority. Obviously, the bank and the housing authority had a legitimate interest in the matter. A letter of the type sent by Rudiger is not unusual in

commercial matters, and the bank may well have had a duty to advise the Longs of the default before initiating legal action. The reference to legal fees is a strong indicator that legal action was being contemplated by the bank. Indeed, the bank did file suit against the Longs on June 20, 1995. (AMJ ¶ 63.) The court finds that the letter was sent preliminarily to a proposed legal proceeding and that the letter was related to a proceeding that was contemplated in good faith and under serious consideration.

The letter from Michael O. Marks, senior vice-president of the bank, advised the Longs that they were in default on the Queen's Way Loan and that "pursuant to the provisions of § 55-59.1 of the Code of Virginia, 1950, as amended" foreclosure proceedings had been initiated. That code section concerns notices required before a trustee's sale, and these notices are prerequisites to foreclosure and, consequently, to any resulting suit for a deficiency. It is clear that the letter was sent preliminarily to a proposed judicial proceeding that was contemplated in good faith and under serious consideration.

The court's finding with regard to the letters is reinforced by the reasoning in *Donohoe, supra.* In that case a property owner sued a contractor for slander of title and abuse of process because of the contractor's filing of an invalid memorandum of mechanic's lien against the owner's property. The court held that the filing of the memorandum of mechanic's lien was a judicial proceeding because it was an essential step under the code for perfecting a mechanic's lien. *Id.,* 861. Similarly, in the present case, notice of the default and of foreclosure proceedings is required by the code as an essential step to foreclosure.

Next, the defendants argue that the "only publication of the allegedly defamatory statements was privileged." As already discussed, all those to whom the letters were published had a legitimate interest in the underlying loans. In *M. Rosenberg & Sons v. Craft,* 182 Va. 512 (1944), the plaintiff had been a debtor of the defendant but had paid his account in full. The plaintiff's brother-in-law purchased goods from the defendant on credit and had the debt charged to the plaintiff's account. When the plaintiff received a "dunning letter" from the defendant, he advised the defendant that he was not responsible for the debt, and the defendant noted that information on its records. Later the defendant sent a letter to the plaintiff's employer seeking information about his employment. In the letter, the defendant said that the information was sought in order to collect a debt. Plaintiff sued for defamation. The court held that the defendant possessed a qualified privilege to publish the letter to the plaintiff's employer. In reaching that conclusion, the court quoted

a number of sources, both English and American, including the following statement from the *Restatement of the Law on Torts*, § 596:

> An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.

Addressing the case under consideration, the court further opined:

> The great bulk of business is conducted on credit, varying in length from a few days to six months or a year. Creditors, in order to make prompt collections, are compelled to send dunning letters to debtors. To hold that an erroneous statement in such a letter, to the effect that a debt is long past due, is insulting and actionable, would subject creditors to needless hazards and hardships. *M. Rosenberg* at 528; *see also Weaver v. Finance Co.*, 200 Va. 572 (1959).

However, malice will defeat the qualified privilege, which simply relieves the publication from the presumption of malice. 53 C.J.S., *Libel and Slander*, § 59. The Longs alleged malicious publication and would be entitled to the opportunity to submit evidence of malice to the trier of fact if the publication were not absolutely privileged.

Next, the attorney defendants assert that they did not author the letter from Michael O. Marks and are, therefore, not liable for any action on that account. The fact of authorship is largely irrelevant. It is the fact of publication that is key to this issue. The pleadings show that Mr. Marks signed the letter and that it was published on behalf of the bank. The attorney defendants' position is well founded as to Mr. Marks' letter.

Finally, all defendants assert that the words used in the letters do not "tend to violence and breach of the peace." Because of the court's holding as stated above, it is not necessary to address this assertion.

For the foregoing reasons, the court grants summary judgment to the defendants on Counts I and II of the amended motion for judgment.

## II. *The Demurrer to Count III*

The Longs seek damages for defamation against all defendants because:

The aforesaid statements of Mays & Valentine, as set forth in paragraph 49, are materially false statements of fact, and they are defamatory *per se*. They were published to the Longs' tenants, and possibly to others. Amended Motion for Judgment (AMJ) ¶ 59.

Paragraph 49 of the amended motion for judgment reads:

In July of 1995, and thereafter, Mays & Valentine wrongfully communicated with the Longs' tenants at Queen's Way about the Bank's rent seizures and about various building maintenance issues. Further, Mays & Valentine wrongfully led said tenants to believe that foreclosure of Queen's Way was a certainty, and Mays & Valentine told said tenants that it would not be long before foreclosure of Queen's Way would occur. Said statements pertaining to foreclosure were purported statements of fact, which were false, and said statements were approved and/or ratified by the Bank.

The defendants demur on the basis that the Longs failed to plead the precise defamatory and false words that form the basis of their claim.

At best the Longs' allegations contain conclusions about what the defendants may have said to others. There is no effort to plead the exact defamatory words used. A similar situation presented itself in *Federal Land Bank v. Birchfield*, 173 Va. 200, 215 (1939), where the court stated:

The allegations in the original petition do not purport to contain the exact words charged to have been used by the defendant, which is necessary to correctly state a good cause of action for libel, slander, or insulting words. Good pleading requires that the exact words spoken or written must be set out in the declaration *in haec verba*. Indeed, the pleading must go further, — that is, it must purport to give the exact words.

Federal courts favor the use of *in haec verba* pleadings in defamation cases because generally knowledge of exact language used is necessary to form responsive pleadings. See *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692 (8th Cir. 1979) (applying Iowa law). It also appears to be the general rule of pleading:

Generally, the complaint must set out the particular defamatory words as published, even though they are of a shocking and scandalous

nature, and a statement of their substance and effect or meaning is generally held insufficient. 53 C.J.S., *Libel and Slander*, § 133.

The court is of the opinion that the defamatory words used must be alleged *in haec verba*, that the defamatory words were not sufficiently alleged. The demurrer is sustained as to all defendants.

The court observes, but does not decide, that the alleged defamation may be privileged for the reasons given in the court's discussion of the motion for summary judgment with respect to Counts I and II.

### III. *Old Point's Demurrer to Count IV*

The Longs allege that the defendants committed bad faith breaches of the Queen's Way Mall Loan, the Professional Building loan, the agreement between the bank and the Longs to extend the term or to reamortize the Queen's Way Mall Loan, the agreement between the bank and the Longs for the bank to accept reduced monthly payments, the bank's agreement to provide financing on the sale of the Washington Street property with a two-week turnaround, the bank's agreement to accept from the Longs $32,688.74 to cure any alleged payment arrearages, the bank's agreement to allow condominium sales to occur, and the agreement that the bank would accept $8,373.86 on the specific condition that the Queen's Way Mall loan would be reinstated.[3] The bank demurs on several grounds.

### A. *The Agreement to Accept $32,688.74 to Cure Any Alleged Payment Arrearages*

The Longs contend that on or about July 26, 1995, Mays & Valentine drafted, and the bank sent to the Longs, a letter demanding payment of $32,688.74 to cure the alleged arrearages in the Queen's Way Mall Loan. The Longs allege that on August 29, 1995, at approximately 11:59 a.m., they delivered a cashier's check for the amount of $32,688.74 to Old Point's attorney. AMJ ¶ 73. The Longs contend that although the bank accepted payment, it wrongfully continued to consider the Queen's Way Mall Loan to be in default, in breach of Old Point's agreement that the payment would cure the alleged payment arrearages. AMJ ¶ 74. The Longs contend that Old Point's actions are a bad faith breach of their agreement. AMJ ¶ 80.

---

[3] While the amended motion for judgment makes allegations against the bank as well as against the attorney defendants in Count IV, this count seeks damages only against the bank.

The July 26, 1995, letter from Old Point demanding payment of $32,688.74 states: "In order to comply strictly with the terms of the note, the above payments must be received by the Bank by August 28, 1995, or the Bank will accelerate the loan, to the extent the loan is not already properly accelerated." AMJ Exhibit D, at 2. Thus, the facts alleged in the amended motion for judgment establish that the Longs did not comply with this agreement, since the payment was not delivered to the bank's attorney until August *29th*, one day past the deadline of August 28th. The July 26 letter explicitly required that the payment be received by August 28th to avoid acceleration, and it was well within Old Point's rights to continue to consider the Queen's Way Mall Loan in default when the payment was not received on time. Thus, the plaintiff's allegations foreclose the conclusion that Old Point's actions constituted a breach of the agreement to accept $32,688.74 to cure the arrearages.

In their responsive memorandum, the Longs contend that their untimely performance is excused because Robert Long's sister committed suicide on August 28, 1995, necessitating the Longs traveling to Richmond and preventing them from being able to deliver the funds to the bank until their return on August 29. The Longs argue that it is a jury question as to whether the suicide of Robert E. Long's sister and the resulting need to travel to Richmond was a sufficient reason for the delay of delivery of funds under an "Act of God" impossibility theory. However, performance of a contract is only excused by "Act of God" when the performance is rendered impossible, not merely impracticable. The death by suicide of Robert Long's sister did not render it impossible for Robert and Susan Long to submit their payment to Old Point on August 28th as required. While illness can be an Act of God, *Sanders v. Coleman*, 97 Va. 690 (1899), it is far from clear that a suicide constitutes an Act of God. The Act of God doctrine usually contemplates misfortunes and accidents beyond the power of man to control or prevent. *Id.* Suicide, an act produced by human agency alone, seems to be the antithesis of this traditional understanding of the doctrine. The court is of the opinion that the Longs cannot excuse their late payment on this basis.

The plaintiffs also contend that because the delivery of funds on the morning of August 29 had the same effect as a delivery after 2:00 p.m. on the previous day would have had, Old Point received the benefit of its bargain and should not be allowed to refuse its obligation. The Longs argue that this is a breach and in violation of Virginia Code § 8.1-203's duty of good faith in the performance of contracts. To show bad faith, the Longs would need to show that the bank's conduct rose to the level of dishonesty in fact. *Charles E. Brauer Co. v. NationsBank*, 251 Va. 28, 35 (1996). There is no allegation that Old Point acted in a dishonest manner. Instead, the Longs complain that the

bank insisted on strict compliance with the contract by requiring payment by the date stated in the July 26th letter. Insistence on strict compliance does not equal bad faith. *Mahoney v. NationsBank*, 249 Va. 216, 221 (1995) (dealing with UCC obligation of good faith).

The Longs breached the agreement to pay $32,688.74 by August 28, 1995, their failure to timely perform was not excused, and Old Point was justified in holding the Longs in default on the loan. The demurrer is sustained on this point.

### B. *The Professional Building Loan*

The Longs allege that on October 4, 1984, they entered into a promissory note with the Old Point Bank for $300,000.00 and that the bank committed a "bad faith" breach of the terms of the loan. Old Point demurs, contending that the Longs have failed to identify any breach of this agreement. While the Longs contend in their reply brief that allegations of defamatory communications in paragraphs 31-33 and the actions of Old Point in paragraph 27 of the amended motion for judgment allege breach of the Professional Building Loan, none of these paragraphs contain any factual allegations as to why any of these actions constituted breach of this loan. The demurrer is sustained as to this point.

### C. *The Agreement to Extend the Term of and Reamortize the Queen's Way Mall Loan*

The Longs allege that between August and October of 1993, they and Old Point entered into an agreement by which Old Point agreed to extend the term of the Queen's Way Mall Loan to twenty years and to reamortize the loan at the prevailing rate of interest, if the Longs continued to provide Old Point with certain financial information and if the Longs provided Old Point with an appraisal of Queen's Way Mall. AMJ ¶ 13. The Longs allege that, in reliance on this agreement, they ordered an appraisal of Queen's Way Mall, AMJ ¶ 14, and that on March 2, 1994, the bank ordered its own appraisal. AMJ ¶ 18. They further allege that on December 30, 1994, the Bank ordered appraisal was delivered to the Bank, and therefore, all conditions precedent to this were satisfied. AMJ ¶ 24. According to the amended motion for judgment, Old Point breached this agreement on January 11, 1995, when it refused to extend the term of and reamortize the Queen's Way Mall Loan. AMJ ¶ 26. The Longs allege that Old Point further evidenced its breach of this agreement when, at a meeting on or about January 23, 1995, Old Point presented Robert E. Long

with a letter which included requirements substantially and materially different from the terms agreed upon between August and October of 1993. AMJ ¶ 27.

Old Point contends that the Longs have not pleaded any consideration to support this agreement. The Bank argues that the Longs, only promise in relation to this agreement was to pay sums already due and to continue making available financial information they were already under a duty to provide to Old Point. The bank asserts that neither is sufficient consideration to support Old Point's promise to extend the loan. While these promises may not be sufficient consideration, the Longs also alleged that they promised to provide an appraisal of Queen's Way Mall to Old Point. The Longs allege that the appraisal they ordered was delivered to the bank on January 6, 1996. AMJ ¶ 16. This was not a pre-existing duty and thus can serve as consideration for Old Point's promises to extend the term of and reamortize the loan. Any consideration given in good faith, no matter how small, is sufficient to sustain a contract, and the courts will not inquire into the adequacy of the consideration for the promise. *Good v. Dyer*, 137 Va. 114, 119 S.E. 277 (1923); 4B Michie's Jurisprudence, *Contracts*, § 32, at 44. This agreement to provide the appraisal is sufficient consideration. The demurer is overruled.

### D. *The Agreement Between the Bank and the Longs for the Bank to Accept Reduced Monthly Payments*

The Longs allege that during the summer of 1994, they entered into an agreement with Old Point to accept reduced monthly payments in the amount of $6,225.18 with respect to the Queen's Way Mall Loan while the parties were awaiting receipt of the appraisal ordered by Old Point. AMJ ¶ 22. The Longs allege that they made the monthly payments from May, 1994, to January, 1995, and Old Point accepted each payment until a satisfactory appraisal was delivered to Old Point. AMJ ¶¶ 22, 24. This agreement, the Longs contend, was breached by Old Point. AMJ ¶ 80.

Old Point contends that the Longs have failed to plead any consideration for this promise to accept reduced monthly payments. The Longs counter that Old Point is estopped to deny the existence of this agreement but fail to explain the basis of this estoppel theory. Looking solely at the amended motion for judgment, there is no consideration alleged. While the Longs suggest that, after the completion of discovery, Old Point will take the position that there was in fact such an agreement but that the agreement was rescinded by a letter dated December 2, 1994, none of these allegations are part of the amended motion for judgment. Confining itself to review of the amended motion for

judgment, as it must, the court concludes that consideration for this promise has not been alleged.

### E. *The Queen's Way Mall Loan*

The Longs allege that on December 12, 1986, they executed a Note payable to the Old Point Bank in the amount of $950,000.00 which was secured by a deed of trust. AMJ ¶ 7. This is referred to throughout the amended motion for judgment as the Queen's Way Mall Loan.

Old Point contends that nowhere in their pleading do they identify the breach of this note. However, the Longs allege that Old Point breached this note in several ways, including by wrongfully declaring defaults in connection with this loan and wrongfully setting in process foreclosure proceedings in connection with this loan. AMJ ¶¶ 41, 63, 80. The demurrer is overruled.

### F. *The Agreement to Provide Financing on the Sale of the Washington Street Property*

Paragraph 26 of the amended motion for judgment alleges that on January 11, 1995, Old Point agreed to finance the prospective purchaser of Robert E. Long's Washington Street property with a two-week turnaround on the prospective purchaser's loan. AMJ ¶ 26. The Longs allege that they relied on this agreement by entering into a contract to sell the Washington Street property on January 25, 1995. AMJ ¶ 28. In paragraph 80, they allege that Rudiger's, Mays & Valentine's, and Old Point's actions constituted a bad faith breach of Old Point's agreement to provide financing on the sale of Washington Street with a two-week turnaround. AMJ ¶ 80(v).

The Longs have sufficiently pleaded the material terms of this agreement. "[A] demurrer will not be sustained where a motion for judgment states the substance but not the details of an alleged contract because the details may be obtained by motion for bill of particulars." *Allen v. Aetna Casualty & Surety*, 222 Va. 361, 363 (1981). Judged under this standard, the allegations in paragraph 26 of the amended motion for judgment sufficiently state the material terms of the agreement. The Longs have also sufficiently alleged damages as a result of the alleged breach of this agreement. *See* AMJ ¶¶ 81, 28.

However, the Longs have not sufficiently alleged a breach of this agreement. While paragraph 80 of the amended motion for judgment states that Old Point's actions constituted a "bad faith breach" of this agreement, AMJ ¶ 80(v), this is insufficient. Stating that the actions constitute a "breach"

merely expresses a legal conclusion. To withstand a demurrer, the plaintiff must allege *facts* demonstrating the defendant's breach of the agreement. The only facts alleged by the Longs in relation to this agreement are the allegation in paragraph 26 setting out the agreement and the allegation in paragraph 41 stating that "the Longs had allowed the Bank to finance their Washington Street purchase." Thus, the only facts pleaded concerning this agreement suggest Old Point's performance, rather than breach. In their brief in opposition, the Longs claim that Old Point breached the agreement by failing to perform the financing within the agreed-upon two-week period, this factual allegation is nowhere to be found in the amended motion for judgment. Because this court, in deciding a demurrer, is limited to the pleading itself and any attached exhibits, the factual allegations contained in the brief may not be considered. Thus, the allegations supporting the cause of action for breach of the agreement to provide financing on the sale of the Washington Street property are deficient. The demurrer is sustained with leave to amend.

### G. *The Agreement to Allow Condominium Sales to Occur*

The Longs allege that on December 8, 1993, Robert Long requested that Old Point modify the Queen's Way Mall Loan by permitting partial releases as condominium units were sold, with release fees to be paid to Old Point and a reamortization of the remaining loan balance. AMJ ¶ 15. The Longs allege that on February 14, 1994, they entered into two contracts to sell condominium units and that copies of those contracts were provided to Old Point. AMJ ¶ 17. The Longs allege that when the first condominium sale closed, the Bank honored its agreement to release the sold condominium in return for a $35.00 per square foot release fee. AMJ ¶ 20.

The Longs have sufficiently pleaded the material terms of this agreement. The allegations in paragraph 15 concerning Robert Long's request for a modification from Old Point, combined with the later allegations indicating Old Point's agreement with this request and performance under this agreement taken together sufficiently state the basic terms of this agreement.

The Longs fail sufficiently to plead the breach of this agreement, however. The Longs' amended motion for judgment only mentions two contracts to sell condominium units. AMJ ¶ 17. The Longs admit in their pleading that when the first one closed, Old Point honored its agreement to release. The Longs do not indicate what happened to the other condominium contract, which was scheduled to close on February 14, 1995. The amended motion for judgment is barren of any allegations indicating that Old Point failed to live up to the agreement and release this condominium at the time of closing. Again, the

mere allegation in paragraph 80(vii) that Old Point's conduct was a "bad faith breach" of this agreement is a legal conclusion and is insufficient to withstand the demurrer. The demurrer is sustained.

H. *The Bank's Agreement to Accept $8,373.86 on the Specific Condition That the Queen's Way Mall Loan Would Be Reinstated*

The Longs allege that on September 14, 1995, Robert E. Long sent to the Bank $8,373.86 on the specific condition that the Queen's Way Mall Loan be reinstated. AMJ ¶ 77. Old Point, the Longs allege, accepted the payment but did not reinstate the Queen's Way Mall Loan. AMJ ¶ 78.

Robert Long's sending of the money with the specific condition constitutes an offer to Old Point. As acceptance of an offer may be inferred from the acts or conduct of the offeree, the allegation that Old Point kept the payment, while knowing of the specific condition, is a sufficient allegation of acceptance of the offer. Furthermore, the allegation that Old Point failed to reinstate the loan sufficiently pleads the breach of this agreement.

The difficult issue is whether the Longs have sufficiently alleged any consideration for this agreement. While the allegations indicate that they paid $8,373.86 in return for reinstatement of the Loan, they were already under a duty to pay this amount to Old Point. As mentioned above, paying a debt one is already bound to pay is not consideration. *See Wells v. Hughes*, 89 Va. 543, 16 S.E. 689 (1893); 4B Michie's Jurisprudence, *Contracts*, § 34 at 48. Although this rule can be avoided if there is any new element associated with the repayment, such as payment at an earlier date than required, the facts alleged in the amended motion for judgment do not indicate any of these factors. Thus payment of this amount cannot constitute consideration. The court is of the opinion that the amended motion for judgment fails to set out the consideration.

The demurrer to Count IV is sustained to the extent stated.

IV. *The Demurrer to Count V*

Previously, this court sustained a demurrer to the Long's claim of intentional infliction of emotional distress. The Longs now seek to recover for negligent infliction of emotional distress. This count alleges that the negligent actions of Mays & Valentine, David Rudiger, and the Bank directly and proximately caused emotional disturbance and physical injury to Susan Long.

The defendants demur, contending that Count V fails to state a cause of action because of the Longs' failure to allege any physical injury resulting

from the defendants' alleged negligence. The defendants correctly assert that "Virginia courts are reluctant to recognize a claim for negligent infliction of emotional distress," *Cocke v. K-Mart*, 1996 U.S. Dist. Lexis 8205, at *2-3 (W.D. Va. March 8, 1996), and that "the standard for negligent infliction of emotional distress is even more rigorous than the standard for intentional infliction of emotional distress." *Michael v. Sentara Norfolk Gen. Hosp.*, 1996 U.S. Dist. Lexis 14876, at *44-45 (E.D. Va. Oct. 7, 1996).

Both the Longs and the defendants agree that under the Virginia Supreme Court's decision in *Hughes v. Moore*, 214 Va. 27 (1973), there must be an identifiable physical injury before the plaintiff can recover. *Hughes* requires the plaintiff to "plead and prove by clear and convincing evidence that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." *Hughes, Id.* In their reply brief, the Longs contend that Susan Long suffered a physical injury when she fell to the floor from shock and fright after reading the foreclosure letter sent by the defendants. *See* Plaintiff's Reply Brief, at 16-17. However, the only allegations of physical injury in the amended motion for judgment are that Mrs. Long "suffered a severe mental and physical breakdown ... [and] ... was diagnosed with post traumatic stress disorder," AMJ ¶ 42, and that the defendants' actions "directly and proximately caused emotional disturbance and physical injury to Susan Long." AMJ ¶ 83.

Merely alleging unspecified "physical injuries" and a "physical breakdown" is not sufficient to support a cause of action for negligent infliction of emotional distress. The defendants correctly cite *Michael, supra*, 939 F. Supp. 1220 (E.D. Va. 1996), and *Myseros v. Sissler*, 239 Va. 8 (1989), for the idea that allegations such as those made by the Longs here are not sufficient to show the physical injury required. In *Michael*, the plaintiff pleaded that "she suffers from emotional and mental disturbance 'resulting in physical harm'." The Court found these allegations to be insufficient to state a physical injury and dismissed the negligent infliction of emotional distress count for failure to state a claim. *Michael*, at 1223. The Court in *Michael* stated that to proceed under this cause of action, "[t]he plaintiff must put forth clear and convincing evidence of 'symptoms' or 'manifestations' of physical injury; symptoms of emotional disturbance alone provide no basis for recovery." *Id.* at 1224-25. The Longs have not satisfied this standard as their allegations of physical injury are nearly indistinguishable from those made in *Michael*.

Moreover, the Longs' allegation that, as a result of the defendants' conduct, Mrs. Long suffers from post-traumatic stress disorder, AMJ ¶ 42, is also insufficient as an allegation of physical injury. The Court in *Myseros* specifically stated that post traumatic stress syndrome is not a symptom or

manifestation of physical injury, but instead "merely ... an underlying emotional disturbance." *Myseros* at 12.

The demurrer to Count V is sustained.

## V. *Demurrer to Count VI*

Count VI alleges that the defendants interfered with existing contracts and prospective business or economic advantages of the Longs in several ways: (1) they caused the Longs' tenants to breach their leases by paying rents to the Bank rather than the Longs, and they caused some of the tenants to fail to pay rent at all, to vacate Queen's Way Mall, and to become hostile to the Longs; (2) they interfered with the prospective leases between the Longs and the Treasurer and Commissioner of Revenue of the City of Hampton; (3) they interfered with the prospective sale of condominiums to the aforesaid condominium purchaser and others.

The defendants demur, contending that Count VI is deficient as a matter of law because the plaintiffs have failed to plead facts necessary to establish the existence of these expectancies, the defendants' knowledge of the expectancies, that the defendants intentionally interfered with the expectancies, that the alleged interference was accomplished through improper methods, or that absent the defendants' conduct, the Longs would have realized the expectancies.

### A. *Interference with the Longs' Contracts with the Queen's Way Mall Tenants*

To state a cause of action for tortious interference with an existing contract, the Longs must allege: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference with the relationship inducing or causing a breach or termination of the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Chaves v. Johnson*, 230 Va. 112, 120 (1985).

The defendants contend that this Count is deficient because the Longs fail to plead facts supporting the allegation that the tenants in Queen's Way Mall breached their leases or that the defendants intentionally interfered with the contracts between the Longs and the tenants. The court sustained a demurrer to this count in the original motion for judgment because the Longs failed to sufficiently plead a breach of the lease agreements. The court found that the allegation that the defendants' actions caused the tenants to pay rents to Old Point rather than the Longs did not necessarily indicate a breach of the tenants' leases. Because this paying of rent to the Bank would not necessarily mean the

tenants had committed a breach and because the motion for judgment contained no other factual allegations supporting a breach, the demurrer was sustained. In the amended motion for judgment, the Longs have corrected this deficiency by alleging, among other things: "Rudiger, Mays & Valentine, and the Bank interfered with existing contracts in that they caused the Longs' tenants to breach their leases by paying rents to the Bank and not to the Longs; and by wrongful communications with the Longs' tenants, the defendants caused some of said tenants to fail to pay rent at all, to vacate Queen's Way Mall, and to become hostile to the Longs." AMJ ¶ 85. This allegation corrects the flaws of the original motion for judgment, as the element of breach of the tenants' leases is now clearly alleged and factually supported.

The Longs have also sufficiently alleged that they suffered damage as a result of these alleged breaches. In paragraph 87 of the amended motion for judgment, the Longs plead that "[a]s a direct and proximate result of the actions of Rudiger, Mays & Valentine, and the Bank, the Longs suffered monetary losses equal to the loss of the rents." Contrary to the defendants' assertions, *Chaves* does not require the plaintiff to show that the defendant interfered with the contracts in order to procure a gain or advantage to itself. *See Chaves*, 230 Va. at 122 (merely mentioning this purpose of the tort in dicta). While this factor may be relevant at trial to show that the Longs actually suffered no damages because Old Point applied the rents directly to the Longs' loan account to reduce their debt, the plaintiffs need not disprove this to withstand the demurrer. The Longs have alleged that the tenants breached their leases by not paying rent to the Longs and that the Longs thereby suffered monetary losses equal to the amount of those rents. At this stage, the court must take these allegations as true. They have also pleaded that some of the tenants breached their leases by paying no rent at all. For these tenants, the fact that Old Point may have applied the rents received to the Longs' debt would clearly not matter because Old Point could not possibly have credited rent never paid against the Longs' debt. This allegation sufficiently alleges damages.

The Longs have also properly pleaded the defendants' knowledge of the Longs' contractual relationships with the tenants. AMJ ¶ 86. Moreover, allegations of intentional interference by the defendants with these relationships are contained in several paragraphs of the amended motion for judgment. See AMJ ¶¶ 47, 49, 67, 68.

B. *Interference with the Longs' Prospective Business*

To state a cause of action for tortious interference with a prospective contract, the Longs must plead: (1) the existence of a business relationship or expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to the plaintiff. *Glass v. Glass*, 228 Va. 39, 51-52 (1984). The cause of action must be based on contact that either induces or causes a third party not to enter into a prospective contract with the plaintiff or prevents the plaintiff from entering into a contract. *Allen Realty Corp. v. Holbert*, 227 Va. 441 (1984).

1. *Interference with Prospective Leases with the City of Hampton*

The Longs have alleged the existence, and defendants' knowledge of, the negotiations between the Treasurer and Commissioner of Revenue of the City of Hampton for the lease of a portion of Queen's Way Mall. AMJ ¶¶ 26, 27, 35. They have also alleged the reasonable certainty of these prospective leases as they pleaded that on March 29, 1995, David Yeatts had informed the Longs, as well as Old Point, that the Treasurer and Commissioner of Revenue had chosen Queen's Way Mall as the site of their new offices. AMJ ¶ 34. Furthermore, the Longs have pleaded that absent the defendants' conduct, the Longs would have realized the expectancy. Paragraphs 43-44 indicate that on or about May 3, 1995, the Commissioner of Revenue advised Robert Long that the Bank's foreclosure notice caused serious problems with the negotiations, and that on May 5, 1995, an Assistant City Manager for the City of Hampton advised Robert Long that while Queen's Way Mall was the better site for the offices, the City could not make a decision before the foreclosure date set by Old Point and that the Longs should therefore abandon their reliance on the prospective leases. AMJ ¶¶ 43-44. These facts sufficiently allege that the defendants' actions "induced or caused" the City of Hampton not to enter the leases.

The Longs have alleged that the interference occurred by way of "improper methods." The allegations in Count VI adopt and reallege all the prior allegations of the amended motion for judgment. AMJ ¶ 84.

It is a closer issue as to whether the Longs have sufficiently alleged that the defendants' interference was intentional. The Longs plead that the defendants' actions were "intentional misconduct." This, however, may be too conclusory an allegation without facts supporting it. The Longs, though, do provide

extensive allegations of the defendants' knowledge of the expected contracts with the City of Hampton and the defendants' actions in the face of this knowledge. These allegations taken together are sufficient to state the intentional conduct element.

## 2. Intentional Interference with Prospective Sales of Condominium Units

As to the claim of tortious interference with the prospective sale of condominium units, the defendants demur on similar grounds. The court holds that the Longs have sufficiently pleaded intentional action and improper method for the same reasons as already stated.

The Longs also sufficiently allege the existence, and defendants' knowledge, of the prospective sales of condominium units. The Longs allege that on February 14, 1994, a condominium purchaser signed two contracts, and those contracts were sent to Old Point. AMJ ¶ 17. The Longs allege that on February 11, 1995, and again on January 23, 1995, Old Point was notified that the same condominium purchaser wished to purchase additional condominium space and was ready to close on the second of the two purchase contracts executed on February 14, 1994. AMJ ¶¶ 26, 27. The Longs plead that on June 28, 1995, the same condominium purchaser wished to purchase additional units but that, because of the actions of the defendants, the Longs could not accept the offer. While ultimately the same condominium purchaser did purchase some condominium units, but at a lower price than he had previously been willing to pay, *see* AMJ ¶ 79, this does not change the fact that the original business expectancy was not realized.

The defendants assert that the expectancy of making a sale of an unidentified condominium unit to an unnamed "condominium purchaser" and unidentified "others" is too general to state a claim under Virginia law. However, there is nothing in Virginia law requiring that the identity of the prospective purchaser be disclosed. Instead, the emphasis is always on whether the expectancy (i.e., the transaction) is sufficiently particular and reasonably certain to be realized. *See American Tel. & Tel. Co. v. Eastern Pay Phones, Inc.*, 767 F. Supp. 1335, 1340 (E.D. Va. 1991), *opinion vacated on non-substantive grounds*, 789 F. Supp. 725 (E.D. Va. 1992).

The demurrer to Count VI is overruled.

## VI. *Demurrer to Count VII*[4]

In Count VII, the plaintiffs allege that the Bank, by the actions of its employee representatives and David Rudiger and Mays & Valentine, conspired or combined or attempted to conspire or combine, with the Trustee and/or Substitute Trustees in connection with the Queen's Way Mall Loan and with others whose names are not yet known to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, specifically: (1) to extort money or property from the Longs; and/or (2) to breach the various agreements the Bank had with the Longs; and/or (3) to defame or insult the Longs; and/or (4) to cause physical and emotional injury to Susan Long; and/or (5) to interfere with the Longs' existing contracts and/or prospective business or economic advantages. The Longs concede in their reply brief that it is only Old Point, and not the attorney defendants, that they seek to hold liable for conspiracy under Counts VII or VIII.

Old Point demurs, contending that Count VII fails to plead the essential element of concerted action by and between the defendants and the trustee and/or substitute trustee to accomplish some unlawful purpose or some lawful purpose by unlawful means. Furthermore, the defendants claim that this count is deficient because the Longs fail to plead that they were damaged as a result of any concerted action.

The common law recognizes a cause of action against those who conspire to induce the breach of a contract, even when one of the alleged conspirators is a party to the contract. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 28 (1993). A common law civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some lawful purpose by criminal or unlawful means. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402 (1985). No cause of action exists for conspiracy without damages arising from the effecting result of the conspiracy. *Gallop v. Sharp*, 179 Va. 335 (1942).

The Longs have sufficiently pleaded the element of unlawful purpose or lawful purpose by unlawful means. In paragraph 89 of the amended motion for judgment, the Longs state the alleged unlawful purposes or unlawful means as "to extort money or property from the Longs and/or to breach the various agreements the Bank had with the Longs, and/or to defame or insult the Longs and/or to cause physical and emotional injury to Susan R. Long, and/or to

---

[4] While the Amended Motion for Judgment includes all defendants in Counts VII and VIII, plaintiffs' counsel has advised that these counts are directed only to the bank.

interfere with the Longs' existing contracts and/or prospective business or economic advantages." AMJ ¶ 89.

As to the concerted action element of conspiracy, the Longs' only allegations are contained in paragraphs 89 and 47. In paragraph 89, the Longs plead that "[t]he Bank, by the aforesaid actions of its employee representatives and Rudiger and Mays & Valentine, conspired or combined or attempted to conspire or combine, with the Trustee and/or Substitute Trustees in connection with the Queen's Way Mall Loan, and with others whose names are not yet known ... ." AMJ ¶ 89. These allegations that Old Point "conspired" are clearly just conclusory and not supported by facts as needed to withstand a demurrer. Paragraph 47 alleges that "[o]n or about June 27, 1995, the Bank wrongfully caused its Trustee, Richard C. Beale, to seize the rents from the Longs' Queen's Way tenants ... and the Bank wrongfully caused said trustee to wrongfully communicate with at least ten (10) of the tenants ... ." AMJ ¶ 47. This allegation is also insufficient. As mentioned, an essential element of any conspiracy claim is an agreement or understanding willingly entered into by all parties to it for the accomplishment of an unlawful purpose. However, it is not necessary that a formal agreement be proven. Proof of the agreement or a common purpose can rest upon inferences drawn from relevant and competent circumstantial evidence, such as the acts and conduct of the alleged conspirators themselves. *United States v. Osborne*, 532 F. Supp. 857 (W.D. Va. 1982). Even under this standard, the existence of an agreement between Old Point and the Trustee cannot be inferred from the allegations made in paragraph 47. Simply pleading that Old Point "caused" the trustee to take some action does not provide any evidence that Old Point and the Trustee *agreed* to accomplish this act. As the agreement is the essence of conspiracy, *see Zuniga v. Commonwealth*, 7 Va. App. 523, 375 S.E.2d 381 (1988), this situation cannot result in conspiracy liability. The Longs have failed sufficiently to plead the essential element of concerted action.

The demurrer is sustained.

## VII. *Demurrer to Count VIII*

In Count VIII, the plaintiffs contend that the Bank, by the actions of its employee representatives, Mays & Valentine, and David Rudiger, combined, associated, agreed, mutually undertook, and concerted together, or attempted to do so, with the Trustee and/or Substitute Trustee of the Queen's Way Mall Loan, and with others whose names are not yet known, for the purpose of willfully and maliciously injuring the Longs in their reputation, trade, business,

or estate. The plaintiffs plead that these actions of the defendants violate Virginia Code §§ 18.2-499 and 18.2-500.

The defendants demur, claiming that Count VIII fails to state a claim against the defendants as a matter of law because the Longs failed to plead (1) concerted action; (2) conduct on the part of the trustee and/or substitute trustee that was unlawful or lawful but accomplished by unlawful means; and (3) that the alleged conduct was intentional, purposeful, and without legal justification.

The conspiracy statutes provide, in pertinent part, that "[a]ny two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his ... trade [or] business ... by any means whatever" shall be liable civilly for treble damages. Va. Code §§ 18.2-499 and 18.2-500. The elements of this claim are therefore: (1) a combination of two or more persons for the purpose of willfully injuring the plaintiff in his trade or business; and (2) resulting damage to the plaintiff. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984).

The Longs have failed sufficiently to plead that the conspiracy was for the purpose of willfully and maliciously injuring the Longs in their trade or business as required by § 18.2-499. The Longs' allegations in paragraph 92 that Old Point acted "for the purpose of willfully injuring the Longs in their reputation, trade, business, or profession" is again merely a legal conclusion, unsupported by any facts pleaded in the amended motion for judgment. As it is a requirement that the alleged conduct be directly aimed toward these purposes and that the injury not merely be the result or secondary effect of actions taken for mere personal gain, *Nationwide Mut. Fire Ins. Co. v. Jones*, 577 F. Supp. 968 (W.D. Va. 1984), the allegations here are insufficient.

The demurrer is sustained.