# CIRCUIT COURT OF THE CITY OF NORFOLK

Darryl W. Cummings

v.

Deborah A. Addison

February 24, 2012

Case No. (Civil) CL11-510

BY JUDGE LOUIS A. SHERMAN

## I. Procedural History

This matter comes before the Court on Darryl Cummings' ("Cummings") motion for summary judgment. The instant action began when Cummings filed a complaint, *pro se*, against Deborah Addison ("Addison") alleging intentional infliction of emotional distress, tortious interference, and professional malpractice. Addison answered and counter-sued. In her counterclaim, Addison alleged intentional infliction of emotional distress, two counts of tortious interference with contract, tortious interference with a contract expectancy, and defamation. After he retained counsel, Cummings nonsuited his original complaint, leaving only Addison's counterclaim to be litigated. Addison subsequently withdrew her claim for intentional infliction of emotional distress, and this Court sustained Cummings' demurrer to one of Addison's tortious interference with contract claims and dismissed that claim. On December 15, 2011, Cummings filed the instant motion to grant summary judgment as to Addison's remaining claims. Having fully considered the record and all arguments set forth in the briefs of counsel and during argument, this Court grants Cummings' motion for summary judgment on all counts and dismisses all of Addison's claims with prejudice for the reasons set forth below.

## II. *Background*

In the summer of 2009, Addison, then employed as a personal trainer at Norfolk Yacht and Country Club ("NYCC") and at Norfolk Academy ("NA" or "the Academy"), developed a romantic interest in Julie Cummings ("Julie"), Mr. Cummings' then wife. Addison concedes she pursued this interest by sending a "mildly flirtatious note" to Julie while on NYCC property. (Addison's Br. in Opp. to Mot. for Summ. J. at 3.) Then, on January 12, 2010, Cummings overheard Julie and Addison having a very lengthy and intimate conversation. (*Id.* at 1.) Additionally, around the same time, Cummings discovered that his wife Julie and Addison had exchanged hundreds of text messages during the previous month. (Cummings' Br. in Supp. of Mot. for Summ. J. at 1.) Addison does not dispute that, in February 2010, her and Julie's relationship became physical and intimate. (Addison's Br. in Opp. to Mot. for Summ. J. at 8.) Cummings learned of this relationship in March 2010, and, in April 2010, Cummings and Julie formally separated. (Cummings' Br. in Supp. of Mot. for Summ. J. at 2.) Cummings and Julie's divorce became final in August 2011.

In March 2010, Cummings reported Addison's actions with regard to Julie to the management of NYCC. (*Id.*) NYCC management subsequently warned Addison not to pursue Julie on Club property, as Cummings and Julie were members in good standing. Addison was subsequently fired from NYCC for failure to adhere to this warning. (*Id.*) Addison alleges that Cummings sent an e-mail to the NYCC president, which contained defamatory material and partly forms the basis of Addison's defamation allegation.

Addison was also employed at NA until November 17, 2010. After Cummings and Julie separated, Cummings e-mailed NA's Headmaster ("Headmaster") twice regarding the school's policy concerning personal relationships between school employees and parents of NA students. (*Id.*) Addison alleges that these communications not only contained defamatory material, but also were the reason why NA did not retain her after the Fall 2010 sports season. These allegations form the basis of Addison's defamation claim, as well as the basis for her claims of tortious interference with contract and contract expectancy.

In January 2011, Cummings contacted both the president of NYCC and the Club's attorney and informed them that he would be filing suit against NYCC for the actions of Addison. (*Id.*) Ten days later, Cummings sent NYCC's attorney a copy of the draft complaint Cummings planned to file in the Norfolk Circuit Court. Addison contends that this draft complaint contains several defamatory statements. While the exact draft complaint was never filed in this Court, Cummings filed the instant action against Addison less than ten days after he sent the draft complaint to NYCC's

attorney. The gravamen of the instant action and the draft complaint are substantially similar.

### III. *Standard of Review*

According to the Rules of the Supreme Court of Virginia:

> Any party may make a motion for summary judgment at any time after the parties are at issue. . . . If it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, or, upon sustaining a motion to strike the evidence, that the moving party is entitled to judgment, the court shall enter judgment in that party's favor. . . . Summary judgment shall not be entered if any material fact is genuinely in dispute.

Va. Sup. Ct. R. 3:20. A trial court considering a motion for summary judgment must "accept as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009) (citing *Dickerson v. Fatehi*, 253 Va. 324, 327 (1997); *Carson v. LeBlanc*, 245 Va. 135, 139–40 (1993)).

While summary judgment is available in certain circumstances, it is well settled that it "is a drastic remedy, available only when there are no material facts genuinely in dispute." *Id.* (citing *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 618 (2005); *Smith v. Smith*, 254 Va. 99, 103 (1997); *Slone v. General Motors Corp.*, 249 Va. 520, 522 (1995)). "[I]f the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate." *Id.* (citing *Jenkins v. Pyles*, 269 Va. 383 (2005)).

### IV. *Analysis*

#### A. *Addison's Claim for Defamation (Count V of Counterclaim)*

In her first amended counterclaim, Addison alleges four separate communications where Cummings defamed her. Addison claims that these four instances contain statements that are libelous *per se* "because they imply that [Addison] is unethical, incompetent, not fit to serve as a Physical Fitness Trainer (PFT), and as such are capable of defamatory meaning and construction." (Addison's First Am. Countercl. at ¶ 33.) This Court finds, however, that none of the alleged defamatory statements contain any actionable connotation or meaning.

The first alleged defamatory statement appears in a November 10, 2010, e-mail from Cummings to the NYCC president. This e-mail contained

several attachments, and the alleged offending language is found in the first attachment entitled "NYCC — Cummings Family Time-Line of NYCC Trainer, Debbie Addison, pursuit of NYCC member, Julie Cummings." (Ex. C attached to Cummings' Mot. for Summ. J., C00069-00070.) This e-mail consists of a page and one-half long factual timeline of Addison's interactions with Julie from Summer 2009 until April 2010. (*Id.*) The first sentence of the final paragraph of this attachment reads, "The Cummings family did not join the club for an employee to become a predator, stalk, and harass them or for an environment that would encourage this kind of behavior." (*Id.*). This Court finds that this statement is nothing more than Cummings' opinion and is not an actionable defamatory statement.

The second communication that contains alleged defamatory statements is a draft complaint sent by Cummings to NYCC's attorney on January 15, 2011. (Addison's First. Am. Countercl. at ¶ 11b.) This draft complaint contains five statements Addison alleges are defamatory. The first comes at paragraph six of the draft complaint and reads, "That in her pursuit of one Julie Cummings, Norfolk Yacht & Country Club's employee, Debbie Addison, acted recklessly and intentionally, and her conduct being outrageous, intolerable, and was intended to inflict severe emotional distress on said plaintiff [Cummings]." (Ex. C attached to Cummings' Mot. for Summ. J. at C00121.) The second statement comes in the next paragraph, which reads, "That Norfolk Yacht & Country Club's employee, Debbie Addison, actions, in her pursuit and eventual capture of Julie Cummings' emotions, went beyond all possible standards of decency and is regarded as intolerable in a civilized society." (*Id.*) The third alleged defamatory statement is in paragraph eight of the draft complaint, which reads, "That as a result of Norfolk Yacht & Country Club's employee, Debbie Addison, actions toward plaintiff's wife, Julie Cummings, plaintiff's wife has communicated a desire to end her life and frets not being able to adequately provide for her children." (*Id.*) The fourth alleged defamatory statement is paragraph nine of the draft complaint. This paragraph reads, "That as a direct result of defendant's employee's intentional and reckless acts, plaintiff has suffered severe emotional distress." (*Id.* at C00122.) The fifth and final alleged defamatory statement from the draft complaint comes from paragraph thirty-three, which alleges, "That ultimately defendant Norfolk Yacht & Country Club's employee, Debbie Addison, broke up plaintiff's marriage by using personal information she gathered as a result of her professional relationship with plaintiff's wife, Julie Cummings. Gathering knowledge under these circumstances constitutes professional malpractice." (*Id.* at C00122-123.)

The third alleged defamatory communication is an e-mail from Cummings to the Headmaster of Norfolk Academy on October 28, 2010. (Ex. C attached to Cummings' Mot. for Summ. J. at ADDISON056-57.) This e-mail contains a series of follow up questions after a previous meeting.

The questions are strictly hypothetical, and one of the last questions, and the one Addison seems to take the most umbrage with, is, "If some or all of the above questions were answered with 'yes' would any or all of these actions be characteristics of a predator? If so, would NA have any concerns with this characteristic?" (*Id.* at ADDISON057.) This Court finds this communication too laden with uncertainty and opinion to form the basis of an action for defamation.

The final communication, which contains alleged defamatory statements, is a November 1, 2010, e-mail from Cummings to NA's Headmaster. (*Id.* at ADDISON51-55.) This e-mail contains a request from Cummings that NA "consider filing a formal complaint with [Addison's] certifying organizations." (*Id.* at ADDISON51.) The e-mail then contains pertinent portions of the ethical codes for several physical trainer organizations. Addison contends that this e-mail "falsely insinuated [her] actions were unprofessional and unethical in her profession as a personal trainer and consisted of conduct reflecting a conflict of interest or 'reflect[ing] negatively on the profession' of personal training." (Addison's Br. in Opp. to Cummings' Mot. for Summ. J. at 18.) In reality, this e-mail contains no defamatory statements or implications. Cummings has merely e-mailed Norfolk Academy's Headmaster with a request that he consider filing a complaint against Addison. Like the first e-mail to NA's Headmaster, the Court finds this e-mail too laden with opinion and uncertainty to support a claim for defamation.

### 1. Cummings' E-mail to NYCC President is Non-Actionable Opinion

In Virginia, "pure expressions of opinion . . . cannot form the basis of an action for defamation." *Chaves v. Johnson,* 230 Va. 112, 119, 335 S.E.2d 97, 101 (1985). The Supreme Court of Virginia has defined non-actionable opinion as "speech which does not contain a provably false connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person." *Yeagle v. Collegiate Times,* 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998). The Supreme Court of Virginia further refined this definition by holding that "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Fuste v. Riverside Healthcare Ass'n,* 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003). This Court finds that the statement at the end of Cummings' two-page factual timeline is non-actionable opinion because it merely states his interpretation of the preceding factual events.

Cummings' statement that his family "did not join the club for an employee to become a predator, stalk, and harass them or for an environment that would encourage this kind of behavior," is best interpreted as an expression of exasperation or frustration with NYCC for what Cummings perceived as NYCC's inadequate response to a very upsetting situation.

(Ex. C attached to Cummings Mot. for Summ. J. at C00070.) Furthermore, in a case interpreting Virginia law, the Fourth Circuit Court of Appeals held that, where a party "discloses the factual basis for his disagreement, allowing the reader to draw her own conclusions . . . suggests . . . more of an opinionated and hyperbolic screed than a defamatory" statement. *Schnare v. Ziessow*, 104 F. App'x 847, 852 (4th Cir. 2004). This is precisely the case here. Cummings has laid out a lengthy series of factual statements and concludes the document with his interpretation or opinion of what the facts indicate. Because so many facts are presented in the document, the reader, in this case the NYCC president, is perfectly able to ascribe his or her own interpretation of the facts and is more than welcome to disagree with Cummings' opinion as to what the facts show. Cummings' conclusions about Addison are entirely dependent on his interpretation of the facts, and the document leaves ample room for disagreement. When combined, these factors indicate that the alleged defamatory statement at the end of Cummings' e-mail is simply a statement of opinion and is not defamatory.

### 2. *The Statements in the Draft Complaint Are Absolutely Privileged*

Paragraph 11b of Addison's amended counterclaim lays out five different alleged defamatory statements contained in a draft complaint Cummings sent to NYCC's attorney on January 15, 2011. The alleged offending statements are located in paragraphs 6, 7, 8, 9, and 33 of the draft complaint. (*See* Ex. 2 attached to Addison's Br. in Opp. to Mot. for Summ. J. at ADDISON204-209.) It is well settled in Virginia that "communications made in proceedings pending in court or before a quasi-judicial body" are absolutely privileged and cannot form the basis of a defamation cause of action. *Lindeman v. Lesnick*, 268 Va. 532, 537, 604 S.E.2d 55, 58 (2004). A statement that is absolutely privileged is "accorded complete immunity." *Id.* While the Supreme Court of Virginia in *Lindeman* declined to extend the absolute privilege to "mere potential litigation," the question remains as to whether the absolute privilege extends to proposed litigation. *Id.* at 538, 604 S.E.2d 55, 58. Two Virginia circuit court cases have addressed the issue of whether the absolute privilege applies to proposed litigation. Both the Norfolk Circuit Court and the Fairfax County Circuit Court have held that the absolute privilege does indeed extend to proposed litigation. *See Long v. Old Point Bank of Phoebus*, 41 Va. Cir. 409 (Norfolk 1997); and *Mansfield v. Bernabei*, 82 Va. Cir. 511 (Fairfax Co. 2011). This Court finds *Long* and *Mansfield* to be persuasive and holds that Cummings' draft complaint, sent to NYCC's counsel less than two weeks prior to the filing of his complaint in this case, is absolutely privileged because it is a communication made preliminary to proposed litigation and was not made in anticipation of mere potential litigation at some point in the distant future.

This Court begins its analysis with *Long v. Old Point Bank of Phoebus*, 41 Va. Cir. 409 (Norfolk 1997). In *Long*, Judge Poston of the Norfolk Circuit Court considered whether two alleged defamatory letters were absolutely privileged as being sent preliminary to a judicial proceeding. *Long*, 41 Va. Cir. at 410. In his analysis, Judge Poston examined the *Restatement (Second) of Torts*, §§ 586 and 587, as well as several cases from Kentucky and North Carolina. *Id.* at 410-13. In reaching his conclusion that the absolute privilege extends to communications made preliminary to a proposed judicial proceeding, Judge Poston found that the Virginia Supreme Court would likely find the *Restatement (Second) of Torts* persuasive. *Id.* at 412. The *Restatement* contains two sections that deal with this particular issue. The first is Section 586, which reads, "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution thereof, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Restatement (Second) of Torts*, § 586. Section 587 extends the privilege to "*a party* to private litigation or a private prosecutor or a defendant in a criminal prosecution." *Id.* at § 587 (emphasis added). In adopting the *Restatement*'s approach, Judge Poston laid out a two-part test for determining whether the absolute privilege applies to a communication made preliminary to a judicial proceeding. *Long*, 41 Va. Cir. at 414. The first step is to make a determination whether "the statement was made preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding." *Id.* (citations omitted). Once it has been determined that the statement was made in advance of a proposed judicial proceeding, the court must next "evaluate the content of the statement to determine if it has some relation to a proceeding that is contemplated in good faith and under serious consideration." *Id.* (citations omitted). Using this two-part test, Judge Poston found that the two letters in question were sent preliminary to a proposed judicial proceeding that was contemplated in good faith and was under serious consideration. *Id.* at 414-15. In making this determination, Judge Poston relied heavily on the fact that all recipients of the letters "had a legitimate interest" in the content of the letters. *Id.* at 415.

Addison argues that *Lindeman v. Lesnick*, 268 Va. 532, 604 S.E.2d 55 (2004), has overturned the *Long* decision. In making this argument, Addison points to the language in *Lindeman*, which states, "To accept Lindeman's assertions would require this Court to extend the absolute privilege to mere potential litigation. We decline to do so. The logical extension of Lindeman's contentions would effectively erode the absolute privilege to permit defamatory communications to be made with impunity merely upon an assertion that litigation might be subsequently initiated." *Lindeman*, 268 Va. at 538, 604 S.E.2d 55, 58. Addison's contention that *Lindeman*

overturned *Long* is without merit because the situation and language used in *Lindeman* is readily distinguishable from that in *Long* and the case at bar. In *Lindeman*, the defendant claiming the absolute privilege accidentally published defamatory material about the plaintiff. The defendant claimed that the alleged defamatory statements were published to a lawyer who had been retained to change defendant's workers' compensation doctor from plaintiff to another physician. The defendant claimed that this, coupled with the fact that his workers' compensation claim had not been closed with the Workers' Compensation Commission, afforded his statements absolute privilege. Whether any actual litigation on the part of the defendant would be forthcoming was entirely speculative, and the Supreme Court determined that it was "mere potential litigation."

By contrast, the *Long* decision supports the application of the absolute privilege for claimed defamatory statements made preliminary to proposed litigation. *Long* held that proposed litigation consists of that which is contemplated in good faith and under serious consideration. *Long*, 41 Va. Cir. at 414-15. This Court finds there to be a clear distinction between the "mere potential litigation" contemplated in *Lindeman* and the proposed good faith and seriously considered litigation mentioned in *Long*. This distinction is supported by a recent Fairfax County Circuit Court decision in *Mansfield v. Bernabei*, 82 Va. Cir. 511 (Fairfax 2011). In *Mansfield*, the defendant sent an unfiled draft complaint to the plaintiff. This draft complaint was subsequently filed in the U.S. District Court. *Mansfield*, 82 Va. Cir. at 511. The defendant was then sued for defamation, among other claims, based on the allegations contained in the draft complaint. *Id*. The Fairfax Court followed the *Long* decision and found that the defamatory statements in the draft complaint were absolutely privileged and could not form the basis of a defamation claim. *Id*. at 519. The *Mansfield* court distinguished *Lindeman* noting "A threat of 'might be' litigation to a non-potential defendant is far different than a draft complaint setting out the claim to an intended defendant." *Id*. at 518. In support of this distinction, the *Mansfield* court said that "it was necessary that [the defendant] be forthcoming with his lawyers in order for them to have a complete understanding of the situation. Sharing this information with the [potential defendants] through a Draft Complaint should also enjoy such protection, and with good reason. Everything in dispute is fully set out, and a potential defendant can fairly judge the risks and rewards of a resolution without litigation." *Id*. at 519.

This Court finds the *Mansfield* rationale persuasive, and, applying the two-step analysis set forth in *Long*, this Court also finds that Cummings' alleged defamatory statements contained in the draft complaint sent to NYCC's attorney are absolutely privileged and may not form the basis of a defamation claim. The first step in the *Long* test is to examine the occasion of the communication and "determine if the statement was made preliminary to a proposed judicial proceeding, or in the institution of, or

during the course and as a part of a judicial proceeding." *Long*, 41 Va. Cir. at 414. In *Long*, this aspect of the test was satisfied when the alleged defamatory letters were sent and then two or three months later a suit was filed. In the *Mansfield* case, the draft complaint was published a mere eight days prior to the filing of a suit based on the draft complaint. *Mansfield*, 82 Va. Cir. at 516. In the instant case, as in *Mansfield*, the first prong of the *Long* test is easily satisfied. Cummings published the alleged defamatory draft complaint on January 15, 2011. The instant action was filed on January 24, 2011, *pro se* by Cummings. While the draft complaint and the actual complaint filed by Cummings' differ, the gravamen of the two complaints is substantially similar, and this Court finds that the draft complaint *was* sent to NYCC preliminary to a proposed judicial proceeding and does not represent the mere possibility of litigation. The fact that Cummings sent an actual draft complaint, as opposed to notes (as in *Lindeman*) or letters (as in *Long*), indicates that the proposed litigation was clearly intended rather than some vague specter of future litigation.

The second prong of the *Long* test requires the Court to "evaluate the content of the statement to determine if it has some relation to a proceeding that is contemplated in good faith and under serious consideration." *Long*, 41 Va. Cir. at 414. In *Long*, the two letters were sent primarily to inform the recipients that they were in default on their loans. *Id.* at 415. Judge Poston held that this represents a relation to a contemplated proceeding. *Id.* Likewise, in *Mansfield*, the Fairfax Court determined that the draft complaint was sent to people with legitimate interests in the underlying litigation and that the draft complaint represented a manifestation of a future judicial proceeding under serious consideration. In the case at bar, while the draft complaint itself was never ultimately filed, it certainly has a clear relation to a proposed, and the instant, judicial proceeding contemplated in good faith and under serious consideration. In fact, even though the draft complaint has a different party-defendant than the present *pro se* complaint Cummings actually filed, the gravamen of the two is so substantially similar as to further support the notion that the draft complaint represents a manifestation of a proposed judicial proceeding. As in the present case, the *Mansfield* court had to deal with a draft complaint which contained different party defendants from the complaint which was ultimately filed. *Mansfield*, 82 Va. Cir. at 517-18. The *Mansfield* court ultimately held that while "the restructuring and editing of the Draft Complaint prior to filing the official Complaint further contributed to the reduction of the overall counts. . . . [A] substantially different document was not created by the editing of the Draft Complaint." *Id.* at 518. This Court finds that, even though the draft complaint and the actual complaint that was ultimately filed differ in the allegations brought and the parties named, they are *not* substantially different enough to destroy the absolute privilege. While the actual complaint did not contain NYCC as a party-defendant, it was

nonetheless appropriate to send the draft complaint to NYCC because, at the time of the draft complaint, Cummings was planning on suing NYCC *for Addison's actions* on a theory of vicarious liability. That Cummings ultimately decided to bring suit directly against Addison and not NYCC does not mean that the draft complaint fails to satisfy the second prong of the *Long* test.

For the foregoing reasons, this Court finds that the alleged defamatory statements contained in the draft complaint are absolutely privileged and may not form the basis of a defamation action. The absolute privilege extends not only to communications made in the course of a judicial or quasi-judicial proceeding, but also to communications published preliminary to a proposed judicial proceeding. Cummings' draft complaint satisfies both aspects of the *Long* test in that it was made preliminary to a proposed judicial proceeding and was not just the mere threat of litigation and has a very clear relation to the instant judicial proceeding that was contemplated in good faith and under serious consideration, even though the filed complaint does not match the draft complaint identically.

### 3. *Addison's Communications with Norfolk Academy Are Not Defamatory*

Cummings sent two alleged defamatory e-mails to NA's Headmaster. The first of these e-mails was on October 28, 2010. It contained a series of questions for the Headmaster to consider as a "follow up on our previous meeting and to shed light on a potential future meeting." (Ex. C attached to Cummings' Mot. for Summ. J. at ADDISON057.) The second e-mail was sent on November 1, 2010, and asks NA to "consider filing a formal complaint with [Addison's] certifying organizations." (*Id.* at ADDISON051-55.) This Court finds that neither of these two e-mails contain any defamatory statements or implications.

The October 28th e-mail from Cummings to the Headmaster contains a series of hypothetical questions, which Cummings presents for the Headmaster's consideration in advance of a future meeting. (*Id.* at ADDISON057.) The hypothetical questions, including the alleged defamatory one, read as follows: "Did the NA employee pursue and have an affair with an NA parent? Did the NA employee pursue and have an affair knowing the person was an NA parent? Did the NA employee pursue the NA parent via text and/or cell phone while on the NA grounds? Did the NA employee utilize fellow NA employees to pursue NA parent? Did the NA employee use social networking to pursue NA parent while being an employee of NA? If some or all of the above questions were answered with 'yes,' would any or all of these actions be characteristics of a predator? If so, would NA have any concerns with this characteristic? If NA did have concerns, what action would be taken?" (*Id.* at ADDISON057.)

Addison contends that the question "If some or all of the above questions were answered with 'yes,' would any or all of these actions be characteristics of a predator?" conveys defamatory meaning. This Court finds otherwise. While it is true that "a defamatory charge may be made by inference, implication, or insinuation . . . the meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation." *Carwile v. Richmond Newspapers*, 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954). Additionally, "the province of the innuendo is to show how the words used are defamatory, and how they related to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Id.* In this case, the October 28th e-mail is far too uncertain to contain any defamatory implication. The e-mail contains five hypothetical questions, which Cummings poses to the Headmaster for his contemplation. (Ex. C attached to Cummings' Mot. for Summ. J. at ADDISON057.) The e-mail concludes with Cummings' question "if some or all of the above questions were answered with 'yes,' would any or all of these actions be characteristics of a predator?" (*Id.*) It is this question that Addison claims contains defamatory meaning. She contends that it implies that Addison is a predator. In fact, the answer to this question depends entirely on the answers to the previous five questions, as well as the Headmaster's own assessment of the situation. This statement is too laden with uncertainty to support a claim for defamation. Addison has mischaracterized this e-mail. Addison sees this e-mail as containing an implication that she is a sexual predator and believes that it states affirmatively that she had acted with the characteristics of a predator. In reality, this e-mail simply asks for an opinion by the Headmaster as to whether certain behaviors would be characterized by him and NA to be predatory, and if so, whether NA would be concerned. This Court finds that there is no defamatory meaning or implication contained in the October 28, 2010, e-mail from Cummings to the Headmaster, but simply a request for his opinion.

On November 1, 2010, Cummings sent a second e-mail to the Headmaster. In this e-mail, Cummings states, "I would like for Norfolk Academy to consider filing a formal complaint with the previously mentioned employee's [Addison's] certifying organizations." (*Id.* at ADDISON051.) The e-mail then goes on to attach several pages of ethical guidelines from the National Association of Athletic Trainers and the National Strength and Conditioning Association. It is Addison's contention that this e-mail contains the implication that Addison acted unprofessionally and unethically and is libelous *per se*. In support of her contention that the November 1st e-mail contains defamatory meaning, Addison relies on *Cretella v. Kuzminski*, 2008 U.S. Dist. LEXIS 42152 (E.D. Va. 2008). In *Cretella*, the defendant was found liable for defamatory statements posted on the internet about an attorney. The defendant stated that Cretella was engaged in "what I would

characterize as extortion." *Id.* at \*12-13, \*15-16. The court determined that it could be verified whether Cretella engaged in extortion and that calling for action (in the form of a bar complaint) suggested that this was more than mere rhetorical hyperbole. The facts in this case, however, are clearly distinguishable from those in *Cretella*. In *Cretella*, the defendant published on the internet that "it's time to report [the plaintiff] to the Maryland State Bar Association for attempted extortion. . . ." *Id.* The court viewed this statement, together with an e-mail to the state bar, which was copied to the same website. These two statements were determined to be capable of defamatory meaning. In the case at bar, Cummings merely e-mailed the Headmaster and asked him to consider filing a complaint against Addison. This is a far cry from what happened in *Cretella*. Counsel for Cummings likens the situation at bar to one where a client e-mails the managing partner of a law firm the preamble to the Virginia Rules of Professional Conduct and asks the partner to consider filing a bar complaint after previously alerting the firm to the lawyer's potentially inappropriate activities. (Reply Br. in Sup. of Cummings' Mot. for Summ. J. at 17-18.) This Court finds Cummings' argument persuasive and finds that the opinion in *Cretella* is not controlling here. The November 1, 2010, e-mail from Cummings to the Headmaster does not contain any defamatory statement, nor does it contain any defamatory implication. It is simply a request from Cummings to the Headmaster to consider taking action.

For the foregoing reasons, this Court grants summary judgment as to Count V of Addison's First Amended Counterclaim.

B. *Addison's Claims for Tortious Interference (Counts III and IV of the Amended Counterclaim)*

In addition to bringing a claim for defamation, Addison brings two claims for tortious interference. The first tortious interference claim alleges that Cummings interfered with Addison's contract with NA; the second claim is that Cummings interfered with Addison's contract expectancy at NA. Both of these claims fail as a matter of law.

1. *Cummings Did Not Tortiously Interfere with Addison's Contract with NA*

To establish a claim for tortious interference with a contract, Addison must prove the following four elements: (1) the existence of a valid contractual relationship; (2) Cummings' knowledge of the relationship; (3) Cummings' intentional interference inducing or causing a breach or termination of that relationship; and (4) damages. *See DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 227 Va. 140, 145 (2009). In this case, Addison cannot prove the third element, intentional interference inducing

or causing breach, because NA never breached any existing contract with Addison. By Addison's *own* admission, NA fully performed on its final contract with Addison for the Fall 2010 season. (*See* Def.'s Ans. to Pl.'s First Set of Requests for Admissions No. 6 (attached as Ex. C to Cummings' Mot. for Summ. J.).) Cummings' Request for Admission number six asks Addison to "admit or deny that you were fully paid by Norfolk Academy for your services in accordance with the terms set forth in Exhibit E." (*Id.*) Exhibit E is a letter from the Headmaster dated August 4, 2010, which serves as Addison's contract with NA for the Fall 2010 sports season. (*See,* Ex. C attached to Cummings' Mot. for Summ. J. at ADDISON023.) Under the terms of this contract, Addison was to serve as Assistant Strength and Conditioning Coach, and, in return, NA would pay her a stipend of $2500. (*Id.*) Addison signed this contract on August 8, 2010. (*Id.*) Additionally, Cummings' Request for Admission number five expressly asks Addison to "admit or deny that attached as Exhibit E (ADDISON023) is a true copy of your most recent employment contract with Norfolk Academy." (Def.'s Ans. to Pl.'s Request for Admissions No. 5 (attached as Ex. C to Cummings' Mot. for Summ. J.).) Addison admits that the Fall 2010 contract is in fact her most recent contract with NA immediately before admitting that NA fully performed on that contract. (*Id.*)

There is nothing in the record, or that has been presented to this Court, to suggest that NA breached any contract with Addison. Addison asserted in her reply brief, for the first time in this proceeding, that she was alleged working under an oral contract with NA for the Winter 2010-11 season. There is no evidence in the record to support this allegation, and, by her own admission, the Fall 2010 contract represents the most recent contract with NA. Because Addison was fully compensated for her performance as Assistant Strength and Conditioning Coach for the Fall 2010 season and no contract for any future seasons existed, it is impossible for her to maintain a claim for tortious interference with contract. Addison's claim fails as a matter of law because she cannot prove the third element, that Cummings intentionally interfered with and induced a breach of Addison's contract with NA.

## 2. *Cummings Did Not Tortiously Interfere with Addison's Contract Expectancy*

The elements of tortious interference with contract expectancy are almost identical to those of tortious interference with contract. The former, however, has an additional element. In addition to the four elements discussed above, a plaintiff must also prove the use of improper methods in interfering with a contract expectancy. *Maximus, Inc. v. Lockheed Info. Management System Co.*, 254 Va. 408, 414 (1997). In support of her claim, Addison alleges four improper methods. (First Amend. Counterclaim ¶ 9(i)-(iv).) The first three

of these claims are identical to those that this Court found insufficient in an October 19, 2011, order dismissing Addison's claim for tortious interference with contract with regard to NYCC. Because these methods have already been deemed insufficient in a prior ruling of this Court, this Court will not discuss them here. (*See* Order, Oct. 19, 2011 (citing *Lewis-Gale Med. Ctr. v. Alldredge*, 282 Va. 141 (2011)).) The fourth purported improper method employed by Cummings is the alleged defamation that occurred in his October 28th and November 1st e-mails to NA's Headmaster. Virginia case law is clear that defamation constitutes an improper method. *Duggin v. Adams*, 234 Va. 221, 227-28 (1987) ("Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. . . . Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods."). Because Cummings' statements in the two NA e-mails are neither defamatory nor do they constitute any other "improper method," Addison's claim for tortious interference with contract expectancy fails as a matter of law.

Addison has presented no evidence to support her contention that Cummings used improper methods to tortiously interfere with her contract expectancy with NA. Improper methods have been defined by the Virginia Supreme Court to mean those methods that are "illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* Improper methods do *not* include "actions solely motivated by spite, ill will, and malice toward the plaintiff." *Lewis-Gale Med. Ctr., L.L.C. v. Alldredge*, 282 Va. 141, 151 (2011) (citations and quotations omitted). As has been discussed above, Addison has not shown that Cummings has done anything that is independently tortious. This Court is persuaded by the *Lewis-Gale* decision. In that case, the Supreme Court declined to find the defendant's use of the phrase "organizational terrorist" to be independently tortious. *Id.* at 152. This Court finds that the phrases "organizational terrorist" and "predator" are analogous. Both phrases are emotionally charged and "indicate a personal animus" toward to person accused of such behavior. *Id.* However, this Court finds that the mere use of the word "predator" does not rise to the level of improper methods. Because Addison cannot show that Cummings used improper methods to tortiously interfere with her contract expectancy, her claim fails as a matter of law.

In addition to being unable to prove that Cummings used improper methods, Addison is also unable to show that Cummings ultimately interfered with her contract expectancy with NA. In fact, in his deposition,

NA's Headmaster unequivocally states he "was not swayed by [Cummings]. [He] would not have been swayed by Julie Cummings. The central focus throughout this entire matter was [the son's] well being, the potential for a child to be harmed here, and that's that. It's that — I was not bullied or buffeted by any party in this. [He] was not swayed." (Headmaster's Dep. 38:7-13 (Aug. 12, 2011).) NA's Headmaster makes it clear in his deposition testimony that nothing Cummings or Julie said or wrote to him effected his decision in this case. Addison was terminated from NA to protect the best interest of a student and not because of anything Cummings wrote or said to the Headmaster.

Because Addison cannot prove that Cummings either interfered with her contract expectancy or used improper methods, her claim for tortious interference with contract expectancy fails.

## V. Conclusion

This Court finds that the material facts in this case are not in dispute and that, even by interpreting the facts in the light most favorable to Addison, summary judgment should be granted as a matter of law in favor of Cummings. None of the statements claimed to be defamatory by Addison are actually defamatory. For the reasons set forth above, this Court finds that the alleged defamatory statements found in the draft complaint are absolutely privileged and cannot constitute the basis of a claim. Additionally, this Court holds that the alleged defamatory statements contained in Cummings' e-mail to the NYCC president constitute non-actionable opinion. Furthermore, the two e-mails Cummings sent to NA's Headmaster are too speculative and uncertain to convey any defamatory meaning. Finally, given Addison's own admissions and the discovery in this case, it is impossible for Addison, as a matter of law, to maintain a cause of action for either tortious interference with contract or contract expectancy. Accordingly, this Court grants Cummings' Motion for Summary Judgment.